# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LAURI BURNETT, | : | Case No. 3:16-cv-479 |
| Plaintiff, | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Lauri Burnett brings this case challenging the Social Security Administration's denial of her applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. She applied for benefits on October 8, 2013, asserting that she could no longer work a substantial paid job due to seizures. Administrative Law Judge (ALJ) Eric Anschuetz concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #8), Plaintiff's Reply (Doc. #9), and the administrative record (Doc. #5).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Anschuetz's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since August 26, 2013. She was thirty-eight years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has a high school education. *See* 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).[2]

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Anschuetz that she has had seizures since 2002. (Doc. #5, *PageID* #85). She had "light" seizures from 2002 to 2009. *Id.* at 110. But then her seizures started getting worse, and her doctor found a mass in her brain. *Id.* Plaintiff had brain surgery in 2009 to remove the mass. *Id.* at 97. "And [she] was all right for a couple of years and then [she] started having [seizures] bad again." *Id.*

Plaintiff described a typical seizure: "I start feeling weird. Then basically if I get … overheated a little bit then … I just really start feeling weird. And then a lot of times I just totally blackout, I don't remember …. I just go boom. And then when I do wake up, … it takes a[ ]while for me to -- like when they ask me questions I don't know anything. And then there's sometimes when … I'm completely out and then they take me to the hospital …." *Id.* at 88. When she has really bad seizures and blacks out, Plaintiff's

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

children call the squad to take her to the hospital. *Id.* at 89. Plaintiff estimated that she has bad seizures every three to four months. *Id.* at 97.

She also has other "minor" seizures: "I feel like I'm going to pass out and … then I get like real shaky and I just … have to sit down." *Id.* at 97, 111. "Sometimes I can have them once a week. … I usually have probably sometimes between maybe three or four a month and then I might go a month and, … only have one or so." *Id.* at 111. Sometimes stress can bring on her seizures. *Id*.

Plaintiff usually sees her neurologist every three to six months. *Id.* at 99. But if she has a seizure, she will see him sooner so he can run tests—for example, an MRI—to determine if there is "anything that's abnormal going on" in her brain. *Id*.

Plaintiff explained that she has been prescribed a lot of medications but none stop her seizures completely. *Id.* at 97. At the time of the hearing, she was taking Lamictal and Depakote. *Id.* at 100. The dose of both medicines could not be increased because, when she took a higher dose of Lamictal, she was off balance and unable to walk, and Depakote—"they can't increase that." *Id*. Plaintiff experiences some side effects from her medications: she gets sleepy and does not have as much energy as she previously did. *Id.* at 101.

Plaintiff also gets migraine headaches. *Id.* at 106. She has them approximately once a month. *Id*. She believes they are related to her seizures because "when I first started having seizures I had bad, bad headaches, severe ones to where I couldn't even get out of bed. So … that was how they … took an MRI and … found out … after my headaches and stuff, I'll have my seizures." *Id*.

3

Plaintiff also struggles with her short-term memory: "my short-term memory is like I can't focus. Like if I'm even like counting money or something, I can't do it. [I]t's like the short-term memory has … really messed it up." *Id.* at 91.

Between 2007 and October 2012, Plaintiff worked at O'Reilly—first as a merchandiser and then as a driver. *Id.* at 86, 91. In March 2012, Plaintiff had a seizure and wrecked the company truck—totaling it. *Id.* at 93. Per her neurologist, she was unable to work for six months. *Id*. She was then terminated in October 2012. *Id.* at 94.

She also worked as a substitute custodian at a school for approximately two years—2011 to 2013. *Id.* at 92. While working, she had two seizures. *Id.* at 96. Once, she fell and hit the cement. *Id*. The second time, she was on the bleachers and fell, and someone had to catch her. *Id*. She testified that she became disabled after she had a seizure on her way home from work, wrecked her car, and lost her driver's license. *Id.* at 85.

Plaintiff believes her license was suspended on October 1, 2013 because she had "so many accidents within so many years …." *Id.* at 86-87. Plaintiff's neurologist, Dr. White, did not recommend that her license be suspended prior to that because her seizures were not as severe. *Id.* at 88. But, she explained, "now I'm having them a lot and … when I totally lose [consciousness], I get taken to the hospital. And a lot of times I don't come out of it until I get to the hospital." *Id*.

Plaintiff lives in an apartment with her two children—ages 12 and 15. *Id.* at 101. For exercise, she sometimes walks around the block, but she always needs to have someone with her. *Id*. On a school day, Plaintiff wakes up at 5:00 a.m. to wake up her

daughter and then she lies back down. *Id.* at 103. She gets up again at 6:20 a.m. to wake up her son and then she lies back down. *Id*. She then generally sleeps until 11:00 a.m. or noon. *Id.* at 104. During the day, she eats, tries to wash dishes, watches television, and stays at home. *Id.* at 104-05. If she needs to go somewhere during the day, her mother, father, or grandfather will usually take her. *Id.* at 104. She goes grocery shopping once a week. *Id*.

> **B.** **Medical Opinions**
>
> > **i.** **Philip A. White, M.D.**

Dr. White, Plaintiff's treating neurologist, completed a seizure residual functional capacity questionnaire on November 7, 2013. He indicated that he had treated Plaintiff for approximately seven years and diagnosed temporal lobe epilepsy, medically intractable. *Id.* at 546. Her seizures are complex partial and secondarily generalized. *Id.* On average, she has two seizures per month. *Id*. Her seizures typically last two minutes, and she experiences loss of consciousness. *Id*. She does not always have a warning of an impending seizure and cannot always take safety precautions when she feels a seizure coming on. *Id*. Her seizures do not occur at a particular time of day and there are no precipitating factors. *Id*. After a seizure, she experiences confusion and muscle strain that last twenty to thirty minutes. *Id*. Dr. White opined, after a seizure, "[s]he cannot function at work for up to a day." *Id.* at 547. Plaintiff has a history of fecal or urinary incontinence during a seizure. *Id*. To prevent this, she takes medication—Lamictal—and while her condition is improved, it is not completely controlled. *Id*. Plaintiff is

5

compliant with her medication, and she experiences two side effects from the medicine—dizziness and lethargy. *Id*.

Dr. White opined, during a seizure, other people must clear the area of hard or sharp objects and after, they must turn her on her side to allow saliva to drain from her mouth. *Id*. at 546. Accordingly, Plaintiff's seizures are likely to disrupt the work of co-workers and Plaintiff needs more supervision at work than an unimpaired worker. *Id.* at 547. She cannot work at heights or with power machines that require an alert operator. *Id*. She cannot operate a motor vehicle or take a bus alone. *Id*. As a result of her impairments and/or treatment, Plaintiff is likely to be absent from work once or twice per month. *Id.* at 548.

On May 21, 2014, Dr. White completed a second questionnaire—repeating many of his previous responses. He did, however, change some of his responses. He updated her diagnosis to medically intractable localization related epilepsy and depression. *Id.* at 511-12. He indicated Plaintiff has, on average, three seizures per month, and her last three seizures occurred on May 7, 2014, May 10, 2014, and May 18, 2014. *Id.* at 511. He opined, "Stress increases the frequency of her events." *Id*. After seizures, she experiences confusion and sleepiness for approximately ten minutes. *Id*. Plaintiff's medication includes Lamictal and Depokote, and her side effects include coordination disturbance and tremor. *Id.* at 512. As a result of her impairments and/or treatment, Plaintiff is likely to be absent from work more than four times per month. *Id.* at 513.

Dr. White indicated he had treated Plaintiff since about 2004, and she has had these limitations and restrictions since 2009. *Id.* at 556. His opinion is based on direct

6

observation/treatment, physical examination, his own experience and background, imaging studies, and EEG data. *Id.* at 556.

### ii. Karen Terry, Ph.D., & Cynthia Waggoner, Psy.D.

On March 13, 2014, Dr. Terry reviewed Plaintiff's records and found one severe impairment—minor motor seizures. *Id.* at 123. Dr. Waggoner reviewed Plaintiff's records in May 30, 2014, and affirmed Dr. Terry's assessment. *Id.* at 146.

### iii. William Bolz, M.D., & Gary Hinzman, M.D.

Dr. Bolz reviewed Plaintiff's records on March 13, 2014. *Id.* at 118-27. He opined Plaintiff could never climb ladders, ropes, or scaffolds and should avoid all exposure to hazards—including commercial driving, hazardous machinery, and unprotected heights. *Id.* at 124-25. He concluded Plaintiff is not disabled. *Id.* at 127.

On May 28, 2014, Dr. Hinzman reviewed Plaintiff's records and affirmed his assessment. *Id.* at 141-50.

## III. Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Anschuetz to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

> Step 1: Plaintiff has not engaged in substantial gainful employment since August 26, 2013.
>
> Step 2: She has the severe impairments of minor motor seizure activity and headaches.
>
> Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "medium work …. However, she has a history of seizure activity. Therefore, she must never climb ladders, ropes, or scaffolds, but she has no restriction on climbing ramps and stairs. Her ability to balance, stoop, kneel, crouch, and crawl is unlimited. Still, she must avoid workplace hazards such as unprotected heights and moving mechanical parts. Also, the claimant testified that her driver's license was suspended after she had a seizure in August of 2013. Consequently, she is not able to drive a car for commercial purposes or privately. Her history of seizure activity indicates she would likely miss one day of work two times per year due to a seizure."
>
> Step 4: She is unable to perform any of her past relevant work.
>
> Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #5, *PageID* #s 58-69). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 69.

## V. Discussion

Plaintiff contends that the ALJ erred in finding that her seizures do not meet or equal Listing § 11.02 or § 11.03 and in weighing her treating physician's opinions. The Commissioner maintains that substantial evidence supports the ALJ's finding that Plaintiff does not have an impairment that meets a listing and he properly weighed her treating physician's opinions.

### A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).[3] The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

The ALJ concluded that the opinions of Dr. White, Plaintiff's treating neurologist, were not entitled to controlling or deferential weight. (Doc. #5, *PageID* #66). The ALJ did not provide "good reasons"—or any reason at all—for why Dr. White's opinions fail to meet the two conditions of the treating physician rule. "The failure to provide 'good reasons' for not giving Dr. [White's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation." *Gayheart*, 710 F.3d 365, 377 (citing *Wilson,* 378 F.3d at 544).

Instead of addressing the treating physician rule, the ALJ assigned Dr. White's opinions "little weight" and jumped straight to the factors. This constitutes error: "these factors are properly applied only after the ALJ has determined that a treating-source

---

[3] Soc. Sec. R. 96-2p was rescinded by FR vol. 82, No. 57, p. 15263, effective March 27, 2017. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-2p was still in effect.

opinion will not be given controlling weight." *Id.* at 376 (citing 20 C.F.R. § 404.1527(c)(2)).

Nevertheless, even if Dr. White's opinions are not entitled to controlling weight under the treating physician rule, the ALJ's analysis must continue: "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." Soc. Sec. R. 96-2p, 1996 WL 374188, at *4.

In the present case, the ALJ did address some of the factors. He acknowledged Dr. White is a neurologist. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). He also recognized that Dr. White has treated Plaintiff for several years. (Doc. #5, *PageID* #67). Indeed, in May 2014, Dr. White indicated that he had treated Plaintiff since approximately 2004. *Id.* at 556; s*ee* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you …, the more weight we will give to the source's medical opinion."). The ALJ further observed that Plaintiff saw Dr. White "only once every few months, and around 2013, she went more than a year without seeing him. Notably,

12

[Plaintiff] testified she often called him after she had a seizure, and he would merely adjust her medication." (Doc. #5, *PageID* #67).

To the extent the ALJ is asserting that Dr. White's opinions are entitled to less weight because Dr. White only saw Plaintiff once every few months, the ALJ's finding is not supported by substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the medical source's medical opinion more weight than we would give it if it were from a nontreating source.") There is no evidence in the record that suggests Dr. White should have seen Plaintiff more often. Although there does appear to be a large gap in her treatment with Dr. White, hospital records from that time indicate Dr. White was advised of Plaintiff's ongoing seizures. For example, Dr. Marriott at Miami Valley Hospital noted on March 11, 2013, "I spoke to her neurologist …." (Doc. #5, *PageID* #535). In November 2013, Dr. Baldwin at Reid Hospital "caller her doctor, a neurologist, Dr. Philip White …." *Id.* at 490.

The ALJ also briefly addressed supportability: "Dr. White's opinion is unsupported by objective signs and findings in the preponderance of the record. Although he generally indicated no significant functional limitations, his assessment primarily consists of brief, handwritten responses to checklist questionnaires, with no significant supportive reasoning or documentation." *Id.* at 67. Although Dr. White only includes "brief, handwritten responses to checklist questionnaires, …" he also indicated that his opinion is based on direct observation/treatment, physical examination, his own

13

experience and background, imaging studies, and EEG data.  *Id.* at 556; *see* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

Dr. White also provided his extensive treatment notes.  These notes include, for example, the results of two EEGs.  In March 2012, an EEG revealed focal slowing in right temporal region of Plaintiff's head.  (Doc. #5, *PageID* #391).  Dr. Fisher, the interpreting physician opined, "These abnormalities are consistent with a focal disturbance of cerebral function."  *Id.*  Dr. White then performed a 48-hour ambulatory EEG in April 2012:  "This is an abnormal two-day ambulatory study demonstrating some intermittent polymorphic slow (delta and theta) activity in the right front [to] temporal region, findings indicating the presence of a focal lesion in this region."  *Id.* at 417

To the extent the ALJ was referring to the treating physician rule when discussing supportability, the rule does not require an opinion to be fully supported by objective signs and findings.  Instead, it requires that an opinion be well-supported by medically acceptable clinical and laboratory diagnostic techniques.  But, "it is not necessary that the opinion be fully supported by such evidence."  Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.

In addition, the ALJ addressed consistency, concluding, "[Dr. White's] responses are also inconsistent and not supported by his treatment notes.  As discussed above, Dr. White's progress notes, as well as the emergency room and hospital treatment notes, generally show only intermittent seizures with relatively normal physical and mental

14

examinations." (Doc. #5, *PageID* #67). The ALJ does not identify any specific inconsistencies and does not cite any of the record.

Further, Dr. White's treatment notes reveal an unpredictable pattern of seizure activity. For instance, in May 2014, Dr. White noted, "While she initially seemed to respond to Lamictal as it was reintroduced, her seizure frequency has increased again over the past few months. She now reports at least one secondarily generalized seizure every 2 to 3 weeks and complex partial seizures occurring at least every two weeks or so. She experiences auras at least two or three times each week. She cannot drive because of these issues and so cannot work either." *Id.* at 590. He further indicated that he suspected her level of Lamictal was relatively high because Plaintiff "has some mild difficulty with tandem walking and [a] mild tremor …." *Id.* at 593.

Dr. White then noted in August 2014 that Plaintiff had another secondarily generalized seizure in May "but no further events since that time." *Id.* at 583. She had two auras in July 2014. *Id.* Unfortunately, in December 2014, Plaintiff returned to Dr. White's office after "another recent cluster of complex partial seizures." *Id.* at 569. Dr. White noted that after beginning a new medication, Vimpat, she had no further events. *Id.* Further, she continued to experience occasional side effects from her medications, including difficulty with tremors and balance issues. *Id.*

Between December 2014 and June 2015, Plaintiff was "seizure free." *Id.* at 562. But then in June, she experienced a pair of complex partial seizures. *Id.* Dr. White noted, "There is no room to increase either Depakote or Lamictal and I'm concerned about increasing her Vimpat dose any further." *Id.* He further opined, "No driving." *Id.*

15

Together, Dr. White's notes show Plaintiff struggled with an unpredictable pattern of seizures and this is generally consistent with his opinion.

In contrast to the "little weight" the ALJ assigned to Plaintiff's treating neurologist, he concluded that the opinions of State agency reviewing physicians, Dr. William Bolz and Dr. Gary Hinzman, were entitled to "great weight." (Doc. #5, *PageID* #66). His explanation for this weight was brief and conclusory: "their assessments are generally supported by objective signs and findings in the preponderance of the record, including the records submitted after their assessments. As discussed above, the record overall shows only intermittent seizure activity, infrequent treatment with Dr. White, and relatively good response to medication." *Id.*

The ALJ's failure to apply the same level of scrutiny to reviewing physicians' opinions as he applied to treating neurologist's opinion constitutes error. *See Gayheart,* 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. R. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996))[4] ("A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires."). The ALJ, for example, does not criticize the reviewing physicians for the lack of explanation in their opinions. When asked to explain Plaintiff's postural limitations and how/why the evidence supports his opinion, Dr. Bolz

---

[4] The Social Security Administration issued Soc. Sec. R. 17-2p, effective March 27, 2017, which supersedes Soc. Sec. R. 96-6p. At the time of the ALJ's decision in this case, Soc. Sec. R. 96-6p was still in effect.

16

noted, "due to seizure [disorder]." (Doc. #5, *PageID* #125). Dr. Hinzman did not provide any further information. *Id.* at 148.

### B. Listings 11.02 & 11.03

The ALJ concluded at Step 3 that Plaintiff's seizure disorder did not meet the criteria required by Listing sections 11.02 and 11.03:

> [A]s discussed more fully below, the record does not show the requisite seizure pattern as outlined in Listing section 11.02, or that the claimant has an episodic disorder manifested by an alteration of awareness which causes transient postictal manifestations of unconventional behavior or significant interference with daily activities, as required by Listing section 11.03.

(Doc. #5, *PageID* #62).

Both Listing §§ 11.02 and 11.03 require an individual's epilepsy to be "documented by detailed description of a typical seizure pattern, including all associated phenomena …." Listing § 11.02 requires the seizures occur "more frequently than once a month in spite of at least 3 months of prescribed treatment." Listing § 11.03 requires more seizures—"occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment."

Dr. White did not opine and Plaintiff did not testify that she has seizures "more frequently than once weekly." Dr. White indicated Plaintiff had—on average—two seizures per month in November 2013 and three seizures per month in May 2014. (Doc. #5, *PageID* #s 511, 546). Plaintiff testified that she would "usually have probably sometimes between maybe three or four a month and then I might go a month and …

17

only have one or so." *Id.* at 111. Accordingly, Plaintiff has not established that her seizure disorder satisfies Listing § 11.03's frequency requirement.

At the present time, it is not clear whether Plaintiff meets or medically equals the requirements under Listing § 11.02 because that determination depends on how much weight Plaintiff's treating neurologist's opinions are given.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

### C. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th

Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether her applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

### IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability finding be vacated;

2. No finding be made as to whether Plaintiff Lauri Burnett was under a "disability" within the meaning of the Social Security Act;

3. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4. The case be terminated on the Court's docket.

Date: January 2, 2018            *s/Sharon L. Ovington*
                                 Sharon L. Ovington
                                 United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).